UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

| | | |
|---|---|---|
| EMA GARP FUND, L.P. and LAWRENCE LEPARD, | ) ) ) | Case No.: 1:18-cv-01986-KPF |
| **Plaintiffs,** | ) ) | **COMPLAINT FOR VIOLATION OF** |
| v. | ) ) | **THE FEDERAL SECURITIES LAWS** |
| BANRO CORPORATION and JOHN A. CLARKE, | ) ) ) | **DEMAND FOR JURY TRIAL** |
| **Defendants.** | ) ) | |

_____

## FIRST AMENDED COMPLAINT

Plaintiffs, EMA GARP Fund, L.P. (the "Fund") and Lawrence Lepard ("Lepard") (collectively the "Plaintiffs"), by their undersigned attorneys, for their complaint against Defendants, Banro Corporation ("Banro" or the "Company") and John A. Clarke (collectively the "Defendants"), allege as follows:

## NATURE OF THE ACTION

This is a federal securities action arising out of Defendants' deliberate and unlawful conduct to promote and mislead Plaintiffs to believe that Banro's operations in the Democratic Republic of the Congo ("DRC") were stable and free from interference. Defendants touted and assured Banro's investors, such as Plaintiffs, that Banro had obtained operational stability in the DRC by forming close and sustainable relationships with the local communities. Indeed, Defendants represented that Banro's operations in the Eastern DRC were free of the instability that had plagued the region for some time — all for the purpose of deceiving Plaintiffs and artificially inflating Banro's stock price.

Plaintiffs relied upon Defendants' false and misleading statements and invested millions based upon Defendants' hollow assurances and gross omissions of material fact. Unbeknownst

to Plaintiffs, a violent and ongoing conflict between Banro — one of the world's leading gold mining companies with 100% ownership rights to over $19 Billion in gold reserves in the DRC — and a local population of disenfranchised inhabitants has persisted for years.  The violence has caused significant disruption to Banro's operations in the DRC, which ultimately rendered the Company insolvent by late 2017.

Prior to Banro's acquisition and development of their mining concessions in the Eastern DRC, many of the local inhabitants were artisanal miners who desperately relied upon the lands to survive.   As part of Banro's acquisition of the lands, Banro made numerous promises to the local population — namely, fair compensation for their property, adequate new housing, water and sewer systems, schools and medical facilities, employment, as well as a percentage of revenue generated by Banro's mining operations.   After Banro's acquisition of mining rights to their lands and the population's subsequent "voluntary" relocation, Banro significantly recanted on its grand promises of support, driving the locals into an economic and humanitarian crisis which the shareholders are only now beginning to uncover.   Consequently, a *de facto* state of war between the local inhabitants and Banro raged throughout 2017 to the present — an immensely material fact Banro intentionally concealed from shareholders.

Unbeknownst to Plaintiffs, as a direct consequence of Banro's operations in the DRC, many of the original inhabitants of the mining lands which Banro had developed are suffering from extreme poverty, malnutrition and violence.   As set forth below, when the local inhabitants sought redress for their grievances, they were met with violent retaliation from Banro.

The violence and interference directed at Banro throughout 2017 from the resentful population slowly crippled the Company.   While Banro's stock price plummeted, Defendants intentionally mislead, misrepresented and concealed the extreme operational instability, business

2

interference and critical threat the Company's failure to establish a sustainable relationship with the local population was causing.  The few attacks Defendants did publically disclose only contained half the story and were intentionally mischaracterized by Banro and its Chief Executive Officer, John A. Clarke, as isolated incidents by "bandits" who were "remnants" from DRC's past.

As set forth below, Plaintiffs were lured into a $5 Million investment in the Eastern Congo in reliance upon Banro's promise of establishing a sustainable and stable operating environment through close ties with local communities.  When the risks of Banro's failure to win over the local population materialized, Defendants took affirmative action to mislead investors and conceal the truth.  As a consequence, Plaintiffs continued to purchase and hold stock through the New York Stock Exchange ("NYSE") at an artificially inflated price.

This is a federal securities action to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

Defendants made materially false and misleading statements and omissions regarding the Company's business condition and operational environment.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company's operating segments in the Eastern Congo were subject to a critical threat by the local populations claiming specific grievances against the Company (ii) the threat had in fact materialized and was disrupting its operations (iii) consequently, the Company's operating environment was unstable; (iv) the Company intentionally mislead investors regarding its relationship with the local communities and the stability of its business operations and; (v) as a result, Defendants'

statements about Banro's business and operations were false and misleading and/or lacked a reasonable basis.

## JURISDICTION AND VENUE

1.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

2.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

3.     Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  At all relevant times hereto, Banro's stock traded on the NYSE, located within this Judicial District.

4.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail and the facilities of the national securities exchange.

## PARTIES

5.     Plaintiff, EMA GARP Fund, L.P., is a limited partnership organized and existing under the laws of the State of Delaware.

6.     Plaintiff, Lawrence Lepard, is an individual residing in Norfolk County, Massachusetts.

7.      Defendant, Banro Corporation, is a corporation organized and existing under the laws of Canada with a principal place of business located at 1 First Canadian Place, 100 King Street West, Suite 7070, Toronto, Ontario, Canada.

8.      Upon information and belief, Defendant, John Clarke, is an individual residing in the City of Cardiff, United Kingdom.

## STATEMENT OF FACTS

9.      The Fund is a Boston-based private equity investment fund, investing in growth equities and gold mining stocks throughout the world.

10.      Lepard is a United States citizen, asset manager and professional investor with over 40 years investment experience.  Lepard holds a Masters in Business Administration from the Harvard School of Business and serves as the asset manager of the Fund.

11.      Banro is a Canadian mining company operating exclusively in the DRC, with a focus on the exploration, development and production of gold.  The DRC is reported to have the 10th highest gold reserves in the world.

12.      Although operating in the DRC, the Company is headquartered in Canada, where 60 percent of all the world's mining companies are located and that generate an estimated $50 Billion a year for Canada.  Banro's securities traded on the NYSE under the ticker symbol "BAA", before its delisting for cause on or about January 10, 2018.

13.      Upon information and belief, Banro operates in the DRC through at least four (4) DRC subsidiaries (which in turn are held by Barbados subsidiaries of the Company), as well as its wholly-owned subsidiary incorporated in the United States, Banro American Resources Inc.

14.      Banro began as a mineral exploration company in the 90s and, in 1996, purchased 47 mining concessions that covered more than one (1) million hectares of land in the DRC's North Kivu and South Kivu (Eastern DRC).

15.     Presently, the Company holds a 100% ownership interest in four (4) gold properties, which include two (2) active gold producing mines (Twangiza and Namoya), as well as two (2) sites presently in the exploratory phase (Lugushwa and Kamituga).

16.     Twangiza and Namoya are located along the 210 kilometer long Twangiza-Namoya gold belt in Eastern DRC, which collectively contain an estimated "all category" gold reserve of fifteen million ounces worth in excess of $19 Billion.[1]

17.     In 2012 the Twangiza mine opened for commercial production, followed by Namoya in January of 2016.

18.     From January 1, 2016 through June 30, 2017, Banro generated over $325 Million in revenue from its operations at Twangiza and Namoya.[2]

**Banro Solicits Investment in the DRC**

19.     In or about 2010, Banro was preparing to shift from an exploratory organization, to a full-scale production mining company.  After confirming its mining rights under a highly lucrative agreement with the DRC government, Banro sought to move forward with its mining concessions at Twangiza and Namoya.

20.     However, to commence operations and reap the benefits of its gold concessions, Banro required hundreds of millions of dollars in investment to build its mining facilities and necessary operational infrastructure.

21.     Banro understood the difficulty of raising such a vast investment for operations in the DRC, a country that has suffered from years of civil war, violence and political instability.

22.     In an attempt to gain investor confidence for its necessary capital raise, Banro represented to investors that the region was now "at peace" and that Banro could create a stable

---

[1] As of March 2, 2018, gold trades at $1,321 per ounce.

[2] Financial data after June 30, 2017 is unavailable because Banro has failed and refused to disclose the same, despite having the necessary information, ability and legal obligation to do so.

operating environment through a close and mutually-beneficial relationship with the local communities where Banro would be operating. [3]

23.     Indeed, Banro's marketing strategy emphasized, and in fact predicated, the success of the Company on its dedication and ability to forge a lasting and mutually beneficial relationship of "trust" with the local population.[4]

24.     In connection with its marketing strategy, Banro commissioned several annual "sustainability" reports designed specifically to induce investor confidence in Banro's relationship with local inhabitants, and ability to obtain operational stability in the DRC.

25.     In the reports, Banro describes sustainability as "an investment in Banro's future and in the security, progress and social development of the communities whose support and goodwill the Company enjoys."[5]

26.     Banro made clear how critical sustainability is to its success in the DRC. Accordingly to Clarke, Banro's CEO:

> Banro does not view its investment in sustainability as being discretionary or an "add-on" to its core activities.  Banro understands that the resources spent on sustainability initiatives represents an investment with the same weight as expenditures made for mining equipment.  Sustainability is at the heart of our business and **critical to its success**.[6]

27.     According to Banro, its "most sensitive challenge" in achieving sustainability was the relocation of several thousand local inhabitants from the mining lands of Twangiza and Namoya.  Many of these inhabitants had occupid the lands for generations and relied upon the resources of the land for survival, which included farming and artisanal mining.

---

[3] *See* The Banro Gold Company, at https://www.youtube.com/watch?v=Ei7C2o5uWkg
[4] *Id.*
[5] Banro Corporation 2015 Sustainability Report, p. 5.
[6] Banro Corporation 2014 Sustainability Report, p. 5 (emphasis added).

28.     Artisanal mining broadly refers to mining practiced by individuals, groups or communities often informally and in developing nations.  Artisanal mining can include activities as simple as panning for gold in rivers, which many African villagers have done for hundreds of years for basic survival.  Banro refers to such mining activities as "illegal" because it is done without a license or permit.  Presently, an estimated 13-20 million men, women, and children from over 50 developing countries are directly engaged in the artisanal mining sector.

29.     In furtherance of its marketing strategy, Banro's sustainability reports touted to investors that it had reached "agreements" with the local inhabitants at both Twangiza and Namoya for their "voluntary" relocation, many of whom Banro knew were artisanal miners and farmers.

30.     According to Banro, the agreements were the product of significant consultation with the locals and:

> sets out the aspirations of the community for projects intended to improve education, health, infrastructure, sustainable economic development and employment prospects for the area.  The MOU also details Banro's commitment to provide resources and funding to undertake these projects.  Banro will pay US $1 into the community development fund for every ounce of gold produced by the Namoya mine, together with a contribution of 1% of net profits generated by gold sales from gold produced at the Namoya mine, after capital and taxes once the mine is profitable.[7]

31.     Each sustainability report published from 2012-2017 intentionally creates the false illusion of a company that has invested millions in infrastruture for the local communities, winning over their support and securing a safe and stable operating envirnment for Banro.

32.     As further security for investor confidence in the DRC, Banro also specifically represented within its annual sustainability reports that it would provide timely and continuous disclosure of any material change concerning its sustainability initiative:

---

[7] Banro Corporation 2015 Sustainability Report, p. 16.

As a public company based in North America, Banro Corporation operates within an highly transparent regulatory environment, which includes the continuous disclosure requirements of applicable American and Canadian securities laws. These requirements include timely disclosure of material changes, as well as quarterly and annual financial reporting.[8]

33.     In reliance on the aforementioned representations of Defendants, Lepard and the Fund collectively invested approximately $5 Million in the Company.   The other common shareholders collectively invested over $500 Million.    This investment enabled Banro to commence commercial production of its mining operations at Twangiza in September of 2012, and at Namoya in January of 2016.

### Banro's "Sustainability" Performance at Twangiza and Namoya

34.     Between 2010 and 2012, Banro relocated hundreds of households, containing thousands of inhabitants, from their fertile lands at Twangiza to a barren hilltop at nearby Cinjira.

35.     Despite its representations to investors, including Plaintiffs, in its sustainability marketing materials that the "highly sensitive" relocation was "voluntary", many villagers contend they were forced to leave their homes, some at gunpoint.

36.      The locals further contend the new homes built by Banro were constructed in haste in substandard condition, only containing three (3) rooms and forcing the many families of five (5) or more to seek their own housing elsewhere.  Despite promises of jobs and prosperity, only approximately 30% of the local population received permanent employment by Banro.

37.     According to the residents of Cinjira, much of the purported infrastructure supplied by Banro was build only to serve the mining operations and not for the community, the new development at Cinjira lacked appropriate drinking water and sewer system, and the land itself was impossible to farm.

---

[8] Banro Corporation 2016 Sustainability Report, p. 33.

38.     In addition, they contend Banro closed down all of the artisanal sites and took lands beyond what they understood were within Banro's rights under its agreement with the DRC government.

39.     With farming no longer a possibility, and the artisanal mining sites closed by Banro, the people of Cinjira fell into an economic and humanitarian crisis.

40.     Consequently, many were forced to flee the area without any economic opportunity and without any compensation or resettlement efforts from Banro whatsoever. Rather than make good on its promises of prosperity, Banro created an economic crisis for the original inhabitants of Twangiza.

41.     In addition, despite the Company's representation in its 2017 Sustainability Report that it is "committed to global standards of environmental compliance" and in compliance with the DRC mining code, Banro appears to have also created an environmental disaster at Twangiza.

42.     Indeed, rather than incur the expense for proper disposal of the waste generated from the treatment of the gold minerals, locals contend Banro dug an open pit, dubbed by the community, the "lake of death" where it is common knowledge that wild and domestic animals, as well as livestock, that drink from the "lake" die shortly thereafter.  The contaminated water is also believed by locals to be a cause for the rapidly increasing skin and respiratory illness and birth defects plaguing the local population.

43.     While Banro did construct several schools and medical facilities for the population, locals contend it was inadequate and that Banro refused to provide the teachers or medical professionals necessary for them to operate and benefit the community.

44.     Banro's treatment of the local population at Namoya has been met with equal distain by the local community.  Again, despite its claim of a "voluntary" relocation, mutual prosperity and fair compensation for the loss of their land, in 2013 many inhabitants were forcibly removed from their homes on fertile soil and relocated to the nearby barren village of Mulonda, where Banro again hastily erected substandard structures and inadequate housing to accommodate the dislocated families.

45.     With the artisanal mining sites at Namoya closed, unable to farm, and without sufficient employment opportunities from Banro, the local community at Namoya also collapsed into an economic and humanitarian crisis.

**<u>Community Protests and Violence Ensue</u>**

46.     At the time Banro commenced its commercial mining operations at Namoya in January of 2016, it was apparent to the local population that Banro had no intention of making good on its promises.  Facing poverty due to loss of their livelihood, the local inhabitants staged a peaceful protest march, organized by the Civil Society of Salamabila, at Banro's Namoya mine on January 26, 2016.

47.     In response, Banro took immediate and violent retaliatory action against the protestors.  According to Mwayuma Patience, a local mother of six (6), her husband and leader of the protest march, Salunu Kalumbu Valerien, was summarily executed during the protest by a Congolese security officer contracted by Banro, with a single gunshot to the head.  The security officer also fired randomly into the crowd, injuring three (3) other protesters.

47.     Enraged by the violent and retaliatory response, as well as the murder of their leader, the protestors stormed the Namoya mine, occupying and shutting down the mine for three (3) days.

48.     Consequently, Banro's first month of commercial production at Namoya ended in utter failure, with protest, violence, murder and the complete loss of control of its mine at Namoya to the local inhabitants.

49.     Tellingly, Banro made no mention of the catastrophic event to its shareholders, including Plaintiffs.     Indeed, despite the "critical" importance of maintaining a "sustainable" relationship with the local inhabitants, along with its self proclaimed duty to provide "timely disclosure of material changes," Banro made no mention of the fact that in its first month of operation at Namoya it lost complete control of the mine (containing 3.2 million ounces of gold belonging to the shareholders) to protesters claiming Banro had failed at the very mission upon which it premised its ability to succeed in the DRC.

50.     Thereafter, the desperate local population formed armed militia groups and resorted to violent attacks against Banro, routinely attacking Banro's employees, supply convoys, cars and shuttle buses.

51.     From at least January 26, 2016 forward, Defendants knew Banro had failed to win over the "goodwill" of the local population and deliver on its promises of building a sustainable relationship.  Defendants also knew 1) the local population at the Namoya mine posed a serious and critical threat to its operations at Namoya, and its overall ability to continue business as a going concern; 2) that the risks of its failure to form a sustainable relationship with the local population had materialized and; 3) as a result, Banro's operational environment was unstable and it was sustaining intentional businesses interference.

**Defendants Misrepresent Operational Environment**

52.     Despite having this knowledge, Defendants continued to pepper investors with misleading information about Banro's operational environment in the DRC.

53.     In 2016, Defendants made various public filings with the SEC, making no disclosure of the business interference and risk that had materialize with the local population in January of 2016.

54.     In July of 2016, Defendants published Banro's 2016 Sustainability Report, which as a whole can be read only to mislead investors, such as Plaintiff's, into believing Banro maintained close ties and a sustainable relationship with the local communities.

55.     Despite being titled a "report" the 2016 Sustainability Report tellingly failed to report the January 26, 2016 protest, violence and business interference, instead painting a contrary false illusion of peace and prosperity.

**Operational Risks Further Materialize**

56.     Banro's operational risks further materialized on September 13, 2016, when a Banro convey of 18 vehicles delivering crucial fuel and equipment to the Namoya mine was ambushed at a road block by the local militia.  Thirteen drivers were kidnapped and six (6) trucks were lit on fire and burned.

57.     The local drivers having Congolese citizenship were soon freed without ransom, however, the armed group demanded that Banro pay a heavy ransom for using foreign national drivers.

58.     Again, Banro made no mention of the intentional interference to shareholders.

**Clarke Misleads Plaintiffs**

59.     To the contrary, just days after the attack, Clarke continued Banro's concerted effort to mislead investors, such as Plaintiffs, regarding its compromised operational environment.

60.     At the annual Denver Gold Forum conference held in Colorado Springs September 18-21, 2016, Clarke met with Plaintiffs, and assured them the operational environment at Twangiza and Namoya was stable and operating without interference.

61.     Specifically, on or about September 20, 2016, Clarke met with Plaintiff Lepard and discussed the current operational conditions in the DRC.  At the time, Lepard and his Fund were collectively one of the largest common shareholders in Banro, owning 14,645,577 shares of common stock (representing 5.8% of the outstanding common stock), valued at $4.6 Million.

62.     Lepard specifically inquired as to the operational conditions at Twangiza and Namoya.  Despite having contemporaneous knowledge of the recent attack, knowledge of the grievances claimed by the local populations, as well as the violent protest and loss of control of the Namoya mine in January of 2016, Clarke made no mention of the same and misrepresented the operational environment to Lepard as stable.

63.     Plaintiffs relied on Clarke's misrepresentation and omissions in continuing to hold their stock, as well as purchasing additional shares.

### Attacks Continue and Banro Employees Taken Hostage

63.     On February 7, 2017, Banro sustained a significant and violent direct attack on the Twangiza mine by local militia, resulting in the death of three (3) Banro security officers.

64.     That same month, local militia at Namoya issued documented threats to Banro, leaving leaflets at the mine which threatened further attacks if Banro did not provide support to the local community as promised.

65.     On March 1, 2017, the local population made good on their threats, attacking the Namoya mine and kidnapping five (5) Banro employees and holding them hostage for almost three (3) months.

66.     As part of their demands for the release of the hostages, they insisted Banro make good on its agreement to provide support to the local community and build an infrastructure to benefit them, including jobs, schools and health care facilities.

### Banro Finally Discloses Attack to Shareholders and its Stock Price Drops 30%

67.     On February 7, 2017, Banro made its first public disclosure of violence and disclosed the February 7th attach to the public.  However, in disclosing the attack, which Banro described as being from "armed robbers," it made no mention of any dispute with the local population, leading investors to believe the event was an isolated incident.

68.     Nonetheless, upon news of the incident, Banro's stock price plummeted by a whopping 30% from the date of disclosure to March 8, 2017.

69.     At this time, not only did Defendants fail to disclose to investors the grievances by the local communities at Twangiza and Namoya, but Defendants took affirmative action to intentionally mislead investors, such as Plaintiffs, of the operational environment in order to artificially inflate Banro's falling stock price.

### Defendants Represent Operational Environment as Stable to Halt Falling Stock Price

70.     By late February 2017, in an effort to stop the plummeting stock price, Banro began cold calling investors to solicit their continued investment in the Company.  In connection with their efforts, Defendants prepared a PowerPoint presentation designed to induce investor support (the "Presentation").  In the Presentation, Defendants boldly represented to investors a "Stable Operating Environment" for Banro's operations in the DRC.



71.     Defendants' scienter is clearly demonstrated not only from gravity of the misrepresentation, but equally demonstrated from the timing with the falling stock price, violent attack, and undisclosed written threats and kidnapping.

72.     Contemporaneous with the publication and distribution of the Presentation to investors, such as Plaintiffs, Defendants knew the critical risk and threat the dispute with the local communities posed to the Company. Indeed, contemporaneous with the distribution of the Presentation, Banro was receiving written threats, which proceeded a violent attack on February 7th.

73.     Also contemporaneous with the distribution of the Presentation in March of 2017, five (5) Banro employees at Namoya remained in captivity by armed local militia demanding Banro comply with its contractual obligations to the local inhabitants.

**Defendants Defrauds Shareholders into Approval of Stock Dilution**

74.     As further evidence of Defendants' scienter, in early 2017, Banro had incurred liquidity problems and required additional financing.   In connection with its proposed refinancing through private equity firms Gramercy, Baiyin and Blackrock (the "Lender Group"), demands were made by the Lender Group to drastically dilute the common shareholders in place of the Lender Group.

75.     Faced with the threat of losing its ability to operate as a going concern, and the threat of management losing their lucrative salaries, Banro's management, including Clarke, conceded to the Lender Group's demands and sought to divest the common shareholders of 70% of their stock holdings (the "Restructuring Plan").   Consequently, on January 31, 2017, Banro announced its corporate Restructuring Plan to the public.

76.     However, the Restructuring Plan required shareholder approval by a majority vote.   To obtain such approval, Defendants needed to convince investors that the proposed refinancing was in their best interest and would allow Defendants to return to profitability.   To this end, Defendants used the Presentation to induce investor confidence and obtain shareholder approval of the Restructuring Plan.

77.     In reliance on the Presentation made by Defendants and/or Defendants' failure to disclose the aforementioned operational interference and threats, on March 31, 2017, the common shareholders approved the Restructuring Plan, resulting in Plaintiffs' losing 70% of their investment.

78.     The Presentation coincided directly with the shareholder vote on the Restructuring Plan, Banro's plummeting stock price and sought to induce support from investors, such as

Plaintiffs, by convincing shareholders that Banro's operational environment in the Eastern Congo was "stable."

79.     Tellingly, Banro did not disclose the March 1, 2017 kidnapping until <u>after</u> the shareholders approved the Restructuring Plan on March 31, 2017, instead making the disclosure on or about May 28, 2017 — almost three (3) months after the kidnapping.

80.     Although Banro did disclose the kidnapping in May, it never disclosed the kidnappers' demand for Banro to make good on its agreement to build a beneficial infrastructure as promised for the local population.

**<u>Clarke Misleads Plaintiffs Regarding the Violence</u>**

81.     Clarke went even a step further and entirely mischaracterized and mislead shareholders, including Plaintiffs, as to the nature and cause of the kidnapping.

82.     According to statement given by Clarke shortly after the hostages were finally released in May of 2017, the attack had nothing to do with Banro's dispute with the local community.   In describing the kidnappers, Clarke stated:

> They were looking after their own ends — they were bandits.  I wouldn't say it was poverty-related. Poor people don't do that. It's a mindset. These few bandits are remnants from the country's difficult past, twenty or so years ago — a time of general unrest.

83.     Indeed, according to Clarke the incident did not relate to the impoverished local population because poor people do not take hostages.  Such an illogical statement serves only to further demonstrate Defendants' scienter.

84.     Also according to Clarke, the DRC's "difficult past" was "twenty or so years ago" (1997 or earlier).  Placing the DRC's violent history so far in the past was not only false, but again intended to suppress investor concern over the stability of Banro's operating environment and the security of their investment.

85.     Clarke's scienter is further demonstrated by his intentional omission.   What Clarke failed to disclose is that one of the demands made by the "bandits" looking out for "their own ends" was for Banro to fulfill its promises to the local inhabitants.

86.     Defendants never disclosed to Plaintiffs any grievance or complaint by the local inhabitants, or any alleged failure to live up to the agreements which Banro marketed to investors, and upon which Banro predicated its ability to succeed in the DRC.

87.     In addition, while Banro's employees were being held hostage, Defendants filed with the SEC its 2016 20-F Report, which was equally misleading.

88.     Specifically, in its 20-F filing with the SEC on April 2, 2017, signed by Clarke, Banro stated as follows:

> Some or all of the Company's properties are located in regions where political instability and violence is ongoing.  Some or all of the Company's properties are inhabited by artisanal miners. These conditions may interfere with work on the Company's properties and present a potential security threat to the Company's employees. There is a risk that operations of the Company may be delayed or interfered with, due to the conditions of political instability, violence and the inhabitation of the properties by artisanal miners.  The Company uses its best efforts to maintain good relations with the local communities in order to minimize such risks.

89.     This boilerplate disclosure, only discloses a vague and general threat of "political instability" and violence in the "regions" Banro operates.  The interference and violence alleged against Banro herein had nothing to do with general "political instability" or "violence" in the DRC, nor the mere fact that artisanal miners inhabited Banro's properties.   Rather, the interference was directed specifically at Banro and arose from the Company's alleged failure to perform its agreements and/or deliver on its promises with the displaced local communities.

90.     In addition, at the time of its 20-F filing in April of 2017, Defendants knew that Banro was not using its "best efforts" to maintain "good relations" with the local communities, but rather it had failed on its commitment to support them.

91.     Finally, the disclosure fails to include that such "risk" of interference had in fact materialized and was already causing interference. Indeed, at the time the 2016 20-F was signed by Clarke and filed with the SEC on April 2nd, five (5) Banro employees remained in captivity by armed kidnapers demanding ransom from Banro.

92.     Accordingly, Banro's 20-F was entirely misleading and omitted material facts which further artificially inflated Banro's stock price.

93.     In May of 2017, the locals again attacked and attempted to take control of the Namoya mine, resulting in three (3) deaths and closing the mine for several days. As a result, the staff was fully evacuated from the area.

94.     In July of 2017, a Banro convoy of 23 trucks was ambushed by the local population and all operations at Namoya were again shut down for days. Staff was evacuated and, unknown to shareholders, key management was so concerned for their safety they refused to return to the Namoya mine and worked remotely from a local town for the remainder of the year.

95.     Nonetheless, in late July of 2017 Defendants published Banro's 2017 Sustainability Report, further embellishing and misrepresenting Banro's close ties with the local communities, and making no disclosure of the violent conflict and business interruption it was sustaining in 2017.

96.     In September of 2017, the local population dealt its final death blow to Banro when it took control of the only access road to the Namoya mine, closing the road and

consequently all production at the mine for the remainder of 2017, costing Banro in excess of $25 Million in revenue it could not afford to loose.

97.     Only after Banro claimed insolvency at the end of 2017 as a result of the road closure did Banro finally begin to disclose privately to certain shareholders that Banro was in fact operating in a highly unstable environment.

98.     Specifically, in December of 2017, in a private meeting, Banro's Chief Financial Officer, Rory Taylor, conceded to complaining shareholders that the insolvency on the Company was caused by its highly unstable operating environment.

99.     As a result, on December 22, 2017 Banro filed for restructuring proceedings under the laws of Canada (the "Canadian Proceeding"), seeking to divest all common shareholders of their stock in the Company, contending their $580 Million investment in the DRC is worthless.

100.    In an attempt to understand how common stock in a company with an estimated $19 Billion in gold reserves sitting in the ground, within a "Stable Operating Environment" could be worthless, Plaintiffs have just recently unearthed the truth about Banro's operations in the Eastern Congo.

101.    A recent retaliatory mass killing in February of 2018 is further evidence of the raging conflict between the local inhabitants and Banro.  As recently as February 1, 2018, a local militia attacked a shuttle bus that was carrying Banro employees to the Namoya mine.  The passengers on the bus were released and then the bus was sprayed with gasoline, ignited and destroyed.  In reprisal for this action, it has been reported in local publications (and not by Banro) that security forces went to a nearby village in search of the suspects and summarily executed between 9 and 40 people in reprisal.



## **LOSS CAUSATION**

102.    Following the news of the February 7, 2017 attack, the Company's stock price plummeted, resulting in a 30% stock price drop by March 8, 2018, when the stock price closed at $.135.  Following the news of the May 2018 attack, on May 18, 2017 the Company's stock price fell 10%, or $.10 per share, to close at $.09 per share on May 18, 2017.   In addition, after the attack was announced on July 3, 2017, the Company's stock price fell 12.5%, or $.09 per share, to close at $.63 on July 3, 2017.  When the Namoya mine's road access was closed on September 25, 2017, the Company's shares traded at $.38 per share.   At the time of the filing of Reorganization Proceedings on December 21, 2017, the share price was $.105 per share, and subsequently delisted from the NYSE.  Presently, Banro common stock is entirely worthless.  As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiffs have suffered significant losses and damages.

103.     Accordingly, Plaintiffs purchased and held Banro's securities at artificially inflated prices and were damaged thereby.   As set forth above, the price of the Company's securities significantly declined throughout 2017 while the fallout from misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, materialized through repeated acts of violence and business interference, culminating in the closure of the Namoya mine in September of 2017 and causing investors' losses.

104.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs.

## SCIENTER ALLEGATIONS

105.     As alleged herein, Defendants acted with scienter since Defendants knew that the documents, statements and/or omissions issued or disseminated regarding the Company to Plaintiffs were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.   As set forth above in detail, Clarke made numerous representations and omissions to the investors of Banro, including specifically the Plaintiffs, with the intent to induce investment in Banro, to his benefit and the detriment of Plaintiffs.

## NO SAFE HARBOR

106.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and

conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Banro who knew that the statement was false when made.

<u>**COUNT I**</u>
**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

107. Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 106 of the Complaint as if fully set forth herein.

108. This Count is asserted against the Company and Clarke and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

109. The Company and Clarke, individually, and in concert, directly or indirectly, made the false statements and omissions specified above to Plaintiffs, which they knew, or deliberately disregarded, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made not misleading.

110. The Company and Clarke violated § 10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material

facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs in connection with their sale and purchases of the securities.

111.    The Company and Clarke acted with scienter in that they knew that the statements made and omitted were materially false and misleading; knew that such statements, omissions or documents would be relied upon by the Plaintiffs; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements, omissions or documents as primary violations of the securities laws.

112.    As a result of the foregoing, the price of the Company's securities was grossly inflated and overstated.  In ignorance of the falsity of the Company's and Clarke's statements, Plaintiffs relied on the statements and omissions described above.

113.    Plaintiffs justifiably relied on the accuracy of the facts disclosed by Clarke and the Company and the materiality of facts not disclosed by them.

114.    Had Plaintiffs been aware the Company's securities had been artificially and falsely inflated by the Company's and Clarke's misleading statements and by the material adverse information which the Company and Clarke did not disclose, they would not have purchased or held Banro's securities.

115.    By reason of the foregoing, the Company and Clarke have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs for substantial damages which they have suffered.

116.    Clarke is personally liable for securities fraud for all damages alleged herein because (a) he intentionally made the false statements and omissions and (b) as a director and/or officer of Banro he participated in and had knowledge of their fraud

<u>COUNT II</u>
**Violation of Section 20(a) of The Exchange Act**
**Against Clarke**

117.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 116 of the Complaint as if fully set forth herein.

118.    Clarke participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.

119.    Because of his senior position, he knew the adverse non-public information regarding the Company's value and business operations.

120.    As officer and/or director of the Company, Clarke had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of its business operations, and to correct promptly any statements issued by him or the Company which had become materially false or misleading.

121.    Because of his position of control and authority as the senior officer, Clarke was able to, and did, control the contents of the information which the Company disseminated, or concealed, in connection with the sale, issuance or cancellation of the Company's securities.

122.    Clarke exercised his power and authority to cause the Company to engage in the wrongful acts complained of herein.

123.    Clarke therefore, was a "controlling person" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged which artificially inflated the price of the Company's securities that were sold to Plaintiffs.

124.    By reason of the above conduct, Clarke is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants for rescission and damages, together with attorney fees, costs of suit, interest and such further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.


Dated: March 30, 2018

                                        Respectfully submitted,

                                        **KALBERER LLP**

                                        By: /s/  *Kurt T. Kalberer II*
                                        Kurt T. Kalberer II, Esq.
                                        7 World Trade Center
                                        250 Greenwich Street, 46th Floor
                                        New York, NY 10007
                                        Tel: (212) 266-0044
                                        E-Mail: kkalberer@kalbererlaw.com
                                        *Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Kurt T. Kalberer II, hereby certify that on March 30, 2018, I caused a true and correct copy of the foregoing First Amended Complaint to be served upon counsel for Defendants via US mail.

> Ryan C. Jacobs
> Sophie Moher
> Cassels Brock
> 2100 Scotia Plaza
> 40 King Street
> West, Toronto, Ontario
> M5H 3C2

*<u>Kurt T. Kalberer II</u>*

Dated: March 30, 2018                            Kurt T. Kalberer II