**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

——————————————————————— X

EMA GARP FUND, L.P. and LAWRENCE
LEPARD, Individually and on Behalf of all
Others Similarly Situated,

                Plaintiffs,

      v.

BANRO CORPORATION and JOHN CLARKE,

                Defendants.

——————————————————————— X

:
:
:
:
:
:
:
:   No. 1:18-cv-01986-KPF
:
:
:
:

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**
**OF DEFENDANTS BANRO CORPORATION AND JOHN CLARKE**

AKIN GUMP STRAUSS HAUER & FELD LLP
Stephen M. Baldini
Ira S. Dizengoff
Sara L. Brauner
Stephanie Lindemuth
One Bryant Park
New York, NY 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
sbaldini@akingump.com
idizengoff@akingump.com
sbrauner@akingump.com
slindemuth@akingump.com

*Attorneys for Defendants Banro Corporation and*
*John Clarke*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................ 1

BACKGROUND ............................................................................................. 3

    A.  Overview of the CCAA ...........................................................................3

    B.  Banro's CCAA Proceedings ...................................................................6

    C.  Procedural History.................................................................................8

LEGAL STANDARD ..................................................................................... 10

ARGUMENT .................................................................................................. 12

    PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY
    ON INTERNATIONAL COMITY GROUNDS...................................................12

        A.  Plaintiffs' Claims Against Banro Should Be Dismissed .........................13

            1.  *The Banro CCAA Proceedings Comport With Fundamental Standards
               Of Procedural Fairness* .................................................................13

            2.  *Deferring To The Banro CCAA Proceedings Does Not Violate U.S.
               Law Or Public Policy*.....................................................................16

        B.  International Comity Also Supports The Dismissal Of Plaintiffs' Claims
           Against Clarke For Actions Taken As A Corporate Officer....................20

        C.  Banro Was Not Required To File A Chapter 15 Petition ........................21

    CONCLUSION ........................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ackermann v. Levine*,
788 F.2d 830 (2d Cir.1986)......................................................................................16

*Allstate Life Ins. Co. v. Linter Group Ltd.*,
994 F.2d 996 (2d Cir. 1993)............................................................... *passim*

*Allstate Life Ins. Co. v. Linter Grp. Ltd.*,
No. 91 Civ. 1655 (RPP), 1992 WL 136849 (S.D.N.Y. June 1, 1992), *aff'd* 994
F.2d 996 (9th Cir. 1993) ........................................................................................11

*Bondi v. Capital & Asset Finance Mgmt. S.A.*,
535 F.3d 87 (2d Cir. 2008)......................................................................................19

*Clarkson Co. v. Shaheen*,
544 F.2d 624 (2d Cir. 1976)..............................................................................2, 14

*Cornfield v. Investors Overseas Servs., Ltd.*,
471 F. Supp. 1255 (S.D.N.Y. 1979)........................................................................14

*Cunard S.S. Co. v. Salen Reefer Serv. AB*,
773 F.2d 452 (2d Cir. 1985)............................................................... *passim*

*DiRienzo v. Philip Services Corp.*,
232 F.3d 49 (2d Cir. 2000), *vacated on other grounds* 294 F.3d 21 (2d Cir.
2002) ......................................................................................................................19

*Duff & Phelps, LLC v. Vitro S.A.B. de C.V.*,
18 F. Supp. 3d 375, 377 (S.D.N.Y. 2014)...............................................................10

*E&L Consulting, Ltd. v. Doman Indus. Ltd.*,
360 F. Supp. 2d 465 (E.D.N.Y. 2005) ....................................................13, 18, 19

*Finanz AG Zurich v. Banco Economico S.A.*,
192 F.3d 240 (2d Cir. 1999)...................................................................................12

*Hilton v. Guyot*,
159 U.S. 113 (1895).................................................................................................12

*JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de CV*,
412 F.3d 418 (2d Cir. 2005).............................................................1, 12, 13

*Kramer v. Time Warner, Inc.*,
    937 F.2d 767 (2d Cir. 1991)......................................................................................6, 11

*Lefkowitz v. Bank of N.Y.*,
    676 F. Supp. 2d 229 (S.D.N.Y. 2009).......................................................................11

*Lindner Fund, Inc. v. Polly Peck Int'l PLC*,
    143 B.R. 807 (Bankr. S.D.N.Y. 1992)......................................................................18

*In re Metcalfe & Mansfield Alternative Invs.*,
    421 B.R. 685 (Bankr. S.D.N.Y. 2010)................................................................13, 16

*J.S. ex rel. N.S. v. Attica Cent. Sch.*,
    386 F.3d 107 (2d Cir. 2004).......................................................................................11

*Nat'l Viatical, Inc. v. Universal Settlements Int'l, Inc.*,
    716 F.3d 952 (6th Cir. 2013) ......................................................................................3

*Oak Point Partners, Inc. v. Lessing*,
    No. 11–CV–03328–LHK, 2013 WL 1703382 (N.D. Cal. Apr. 19, 2013) ............................24

*Oui Financing LLC v. Dellar*,
    No. 12 Civ. 7744(RA), 2013 WL 5568732 (S.D.N.Y. Oct. 9, 2013) ............................. *passim*

*Republic of Colombia v. Diageo N. Am. Inc.*,
    531 F. Supp. 2d 365 (S.D.N.Y. 2007)......................................................................10

*Royal & Sun Alliance Ins. Co. of Can. v. Century Int'l Arms, Inc.*,
    466 F.3d 88 (2d Cir. 2006).........................................................................................12

*Smith v. Dominion Bridge Corp.*,
    No. CIV. A. 96–7580, 1999 WL 111465 (E.D. Penn. Mar. 2, 1999)......................18

*Tahan v. Hodgson*,
    662 F.2d 862 (D.C. Cir. 1981)...................................................................................17

*Tradewell, Inc. v. Am. Sensors Elecs., Inc.*,
    No. 96 CIV. 2474(DAB), 1997 WL 423075 (S.D.N.Y. July 29, 1997) ...........................13, 14

*Trikona Advisers Ltd. v. Chugh*,
    846 F.3d 22 (2d Cir. 2017).....................................................................................22, 23

*Victrix S.S. Co. S.A v. Salen Dry Cargo A.B.*,
    825 F.2d 709 (2d Cir. 1987)............................................................................2, 12, 16

**Statutes**

11 U.S.C. § 1126(c) ............................................................................................................5

11 U.S.C. § 1129(b)(2) ..................................................................................................4

11 U.S.C. § 1501(a), (b)..............................................................................................22

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(1) ...............................................................1, 10

Federal Rule of Civil Procedure 44.1 ................................................................3, 11, 12

Defendants Banro Corporation ("Banro") and John Clarke ("Clarke," and together with Banro, the "Defendants"), by and through their undersigned counsel Akin Gump Strauss Hauer & Feld LLP, respectfully submit this memorandum of law in support of their Motion to Dismiss ("Motion") the First Amended Complaint (the "Complaint") filed by EMA GARP Fund, L.P. and Lawrence Lepard (collectively, the "Plaintiffs") under Federal Rule of Civil Procedure 12(b)(1).

## PRELIMINARY STATEMENT

The Second Circuit "ha[s] repeatedly held that U.S. courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding." *JP Morgan Chase Bank v. Altos Hornos de Mex.*, *S.A. de CV*, 412 F.3d 418, 424 (2d Cir. 2005). Where "'the granting of comity to a Foreign bankruptcy proceeding enables the assets of a debtor to be dispersed in an equitable, orderly, and systematic manner, rather than in a haphazard, erratic or piecemeal fashion,' comity has long been recognized as appropriate." *Allstate Life Ins. Co. v. Linter Group Ltd*., 994 F.2d 996, 1000 (2d Cir. 1993) (quoting *Cunard S.S. Co. v. Salen Reefer Serv. AB*, 773 F.2d 452, 458 (2d Cir. 1985)).

Under these well-settled precedents, Plaintiffs' Complaint should be dismissed. On December 22, 2017, facing severe liquidity issues, Defendant Banro initiated restructuring proceedings (the "Banro CCAA Proceedings") in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the Canadian Companies' Creditors Arrangement Act (the "CCAA"), Canada's equivalent to chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"). Since that time, a stay of all actions against Banro and its affiliated debtors (collectively, the "Banro Debtors") has been in place, barring any litigation or other proceedings against the Banro Debtors in Canada or the United States. In late March, the Canadian Court entered a "sanction order" that sanctioned—*i.e.*, approved—Banro's plan of reorganization (the "Plan"). Following that approval, earlier this month, Banro emerged

from reorganization proceedings—as restructured companies do—with a fresh start.  As is typical in both Canadian and U.S. bankruptcy proceedings, claims against the Banro Debtors and their officers and directors, including Banro's chief executive officer ("CEO") John Clarke, were released and extinguished pursuant to the Plan.

Plaintiffs have expressly conceded that they were aware of the Banro CCAA Proceedings from their inception and, indeed, participated in them to a limited extent.  Nevertheless, Plaintiffs filed this action against Banro and Clarke alleging violations of U.S. securities laws at a time when the Banro CCAA Proceedings were ongoing.  The filing of this action, in direct violation of the stay imposed in connection with those proceedings, is a transparent attempt to circumvent the jurisdiction and procedures of the Canadian Court in search of a more favorable forum.

Such international forum shopping is not permitted in this Circuit.  In nearly identical circumstances, where a complaint alleging violations of U.S. securities laws threatened to undermine the orderly distribution of a debtor's assets abroad, the Second Circuit affirmed a trial court's decision to dismiss all claims against both the debtor entity and its officers and directors.  Citing multiple cases "'recogniz[ing] the particular need to extend comity to foreign bankruptcy proceedings,'" the Court found that dismissal of U.S. securities claims in deference to an Australian restructuring proceeding "did not violate any laws or public policies of the United States."  *Allstate*, 994 F.2d at 999 (quoting *Victrix S.S. Co. S.A v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713 (2d Cir. 1987)).  That this case happens to involve Canada—another "sister common law jurisdiction with procedures akin to our own"—makes dismissal no less appropriate.  *Clarkson Co. v. Shaheen*, 544 F.2d 624, 630 (2d Cir. 1976).

Here, the procedures implemented by the Canadian Court during the Banro CCAA Proceedings afforded Plaintiffs ample opportunity to seek redress for their alleged injuries.

Plaintiffs chose not to avail themselves of those opportunities, but that does not render the proceedings unfair or permit the Plaintiffs to sidestep the jurisdiction of the Canadian Court. Nor was Banro required to file a proceeding under chapter 15 of the Bankruptcy Code, given that Banro's restructuring has been focused in Canada, and chapter 15 does not preempt longstanding principles of international comity. In short, for the reasons explained by numerous courts over the past decades, comity should be granted to the Canadian Court and Plaintiffs' Complaint should be dismissed in its entirety.

## BACKGROUND

### A.     Overview of the CCAA[1]

The CCAA, much like chapter 11 of the Bankruptcy Code, is designed to allow financially troubled companies to reorganize rather than liquidate their assets by negotiating with their creditors. *See Nat'l Viatical, Inc. v. Universal Settlements Int'l, Inc.*, 716 F.3d 952, 953 (6th Cir. 2013) ("A CCAA case is similar to a reorganization bankruptcy under chapter 11 of the United States Bankruptcy Code."). As explained in more detail in the declaration of Jane Dietrich filed contemporaneously herewith, the CCAA essentially "provide[s] an insolvent company with the breathing room necessary to maximize the company's value for the benefit of creditors and other stakeholders." Dietrich Dec. ¶ 8.

---

[1] As previously noticed to the Court and Plaintiffs, this Motion necessarily raises issues of Canadian law. To address such legal issues, the Defendants rely on the accompanying Declaration of Jane Dietrich in support of the Motion to Dismiss the First Amended Complaint of Defendants Banro Corporation and John Clarke (the "Dietrich Dec."), as well as the Canadian statutory provisions, rules, regulations, and case law cited therein. Such relevant materials may be considered by this Court in adjudicating this Motion pursuant to Federal Rule of Civil Procedure 44.1. FED. R. CIV. P. 44.1; *see also, e.g.*, *Oui Fin. LLC v. Dellar*, No. 12 Civ. 7744(RA), 2013 WL 5568732, at *2 (S.D.N.Y. Oct. 9, 2013) (holding court may consider Federal Rule of Civil Procedure 44.1 declarations submitted by the parties regarding French law on motion to dismiss on comity grounds).

A CCAA proceeding is initiated when a financially distressed company applies to the Canadian Court for protection from creditors or protection is sought by a third party on a distressed company's behalf. *See id.* ¶¶ 8-9, 12. Once such a proceeding is initiated, the CCAA provides for a stay of proceedings against the debtor for 30 days, similar to the automatic stay provided for in the Bankruptcy Code. *Id.* ¶ 12. The stay may be extended on approval from the court. *Id.* At the outset, a licensed insolvency trustee appointed by the Canadian Court to act as monitor (the "<u>Monitor</u>") must give general notice through publication as well as specific notice to any creditor with a claim worth more than $1,000. *Id.* ¶ 16. Typically, the debtor's management and board of directors remain in place during reorganization, though their discretion is subject to oversight by the Canadian Court and the Monitor, who has fiduciary duties to all stakeholders. *Id.* ¶¶ 9, 15.

To aid the assessment and potential compromise of claims, the CCAA allows a debtor to obtain a claims procedure order. *See* Dietrich Dec. ¶ 23. Such an order typically provides that creditors with claims (including potential, contingent, or unliquidated claims) against either the company or its directors and officers must file a proof of claim by a certain date (a "<u>Bar Date</u>") or face the release and extinguishment of any such claims. *Id.*

A claim that is in respect of an equity interest—including, as relevant here, shareholder claims against a debtor based on allegations of theft, fraud, negligent misrepresentation, fraudulent misrepresentation, breach of trust, or non-disclosure—is considered an "Equity Claim." *Id.* ¶ 34. Similar to U.S. bankruptcy proceedings, a plan may not be approved by a Canadian Court if it provides for the payment of any Equity Claim unless it provides that all other claims are to be paid in full before that claim is paid. *Id.* ¶ 33; *see* 11 U.S.C. § 1129(b)(2) (codifying the "absolute priority rule").

If and when a debtor company reaches a compromise or arrangement with its creditors (akin to a plan of reorganization under chapter 11 of the U.S. Bankruptcy Code), the debtor will request that the Canadian Court "accept" the plan for filing purposes and enter an order scheduling a meeting of creditors and, if the Canadian Court so determines based on a likelihood of economic recovery, the shareholders of the debtor.  Dietrich Dec. ¶¶ 27-28.  At the creditors' meeting, the debtor's creditors will, among other things, vote to accept or reject the plan of compromise or arrangement.  *Id.* ¶ 30.  If the plan is approved by a vote of a majority in number and two thirds in value of voting creditors in the relevant classes (the same voting threshold required under chapter 11 of the U.S. Bankruptcy Code), the debtor may then return to the Canadian Court and request that the plan be sanctioned (*i.e.*, approved).  *Id.* ¶ 30; *see* 11 U.S.C. § 1126(c).  Section 22.1 of the CCAA provides that stakeholders holding Equity Claims are to be in a separate, single class and are not to vote at a meeting, or receive any distribution under the plan, unless the Canadian Court orders otherwise.  Dietrich Dec. ¶ 31.

In determining whether or not to approve a plan, the Canadian Court will consider: (i) whether there is strict compliance with all statutory requirements; (ii) whether all steps carried out during the CCAA proceedings are in compliance with the CCAA; and (iii) whether the plan is fair and reasonable.  *Id.* ¶ 32.  When a plan includes releases of claims against directors, officers, and/or third parties (as is typical), the Canadian Court will take into account the particular circumstances of each case and determine whether the releases are (i) reasonably related to the proposed restructurings and (ii) not overly broad.  *Id.* ¶ 35.  If the Canadian Court approves the plan, and the plan is implemented, it is binding on affected creditors and equity holders.  *Id.* ¶ 36.

Any order of the Canadian Court, including a sanction order, must be appealed within 21 days or such other time as the Canadian Court permits. *Id.* ¶ 38. To preserve the finality of the proceedings and protect the debtor against continued litigation, the CCAA provides clear and strict rules for the circumstances and procedures by which a sanction order may be challenged. The Canadian Court may only amend a final order upon a motion by: (i) a person affected by the order who did not receive notice of the order or who failed to appear at a hearing through accident, mistake, or insufficient notice; or (ii) a party in interest asserting that the order contains an error arising from accident or omission, or that the Canadian Court failed, by error or omission, to rule on a particular aspect of the relevant proceeding. *Id.* ¶ 40. Additionally, a party may seek to suspend or set aside an order only if the order was obtained by fraud, or if new or later discovered facts undermine the order's validity. *Id.*

### B.   Banro's CCAA Proceedings[2]

Banro was a public corporation headquartered in Canada and incorporated under Canadian law. Compl. ¶ 7. Through the Banro Group, Banro was involved in the exploration, development, and mining of gold in the Democratic Republic of the Congo ("DRC"). *Id.* ¶ 11; Dietrich Dec. ¶ 41. Banro faced liquidity challenges in 2017, eventually becoming insolvent and in need of additional liquidity to continue and fund operations. Dietrich Dec. ¶ 41. On December 22, 2017, Banro initiated the Banro CCAA Proceedings, *id.* ¶ 44; Compl. ¶ 99, and

---

[2] The factual allegations in background subsections B and C are either based on the allegations in the Complaint or documentation relating to the Banro CCAA Proceedings, of which the Court may take judicial notice. *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts . . . ."); *see also Oui Fin.*, 2013 WL 5568732, at *2 (taking judicial notice of court filings in defendant's foreign bankruptcy proceedings and considering such filings in ruling on motion to dismiss on comity grounds).

trading of Banro's securities on the New York Stock Exchange was suspended.  Dietrich Dec. ¶ 41.

Pursuant to the initial order issued by the Canadian Court in the Banro CCAA Proceedings (the "Initial Order"), Banro was authorized to take necessary steps to comply with its obligations under an agreement (the "Support Agreement") it reached with its two primary creditors prior to commencing the CCAA proceedings.  *Id.* ¶¶ 46-47.  The Support Agreement contemplated that, if no successful bid for the business and assets of the company could be identified after a court-approved sale and investment solicitation process ("the "SISP"), the Banro Debtors would complete a financial recapitalization in accordance with a previously agreed upon term sheet.  *Id.* ¶ 46.  The Initial Order also outlined service and notice procedures the Banro Debtors were obligated to follow, including:  (i) providing notice to creditors in compliance with the CCAA; (ii) creating a Monitor's website; (iii) and posting on the website all orders, reports, and other information served on the list of parties who appeared in person or by counsel in connection with the Banro CCAA Proceedings (the "Service List").  *Id.* ¶ 48. The Initial Order also described the steps the Monitor was to take in creating and updating the Service List.  *Id.*  In addition to the notice required under the Initial Order, Banro issued a number of press releases on SEDAR (the System for Electronic Document Analysis and Retrieval regulated by Canadian securities administrators) and EDGAR (the Electronic Data Gathering, Analysis, and Retrieval system managed by the SEC) announcing  key milestones and deadlines in the Banro CCAA Proceedings.  *Id.* ¶¶ 49-50.

The Initial Order instituted a stay of all claims, which was later extended through May 3, 2018.  Dietrich Dec. ¶ 45.  On February 1, 2018, the Banro Debtors sought and obtained a claims procedure order (the "Claims Procedure Order") and a meeting order from the Canadian Court.

*Id.* ¶ 53.   Collectively, those orders approved a mechanism for the identification and determination of certain claims against Banro and its officers and directors, accepted the filing of the Plan, and authorized Banro to hold creditors' meetings to vote on the Plan in the event that no successful bid for the company emerged from the SISP.   *Id.*   The court-approved deadlines under the SISP lapsed on March 2, 2018 without a successful bid being identified.   *Id.* ¶ 54.

A few days later, the March 6 Bar Date—*i.e.*, the date by which any claims against Banro and its officers and directors were to be filed pursuant to the Claims Order—also passed without any claims received.   *Id.* ¶ 63.

As a result, Banro proceeded with the creditors' meetings.   Banro's affected creditors overwhelmingly approved the Plan, which, among other things, exchanged secured debt for equity in a new company, compromised certain claims of unsecured creditors for a nominal payment, and extinguished the remaining equity claims.   *Id.* ¶ 55.   On March 27, 2018, the Canadian Court endorsed a sanction order approving the Plan (the "Sanction Order").   *Id.* ¶ 57. On May 3, 2018, the Monitor filed a certificate with the Canadian Court, confirming that the Plan had been implemented and terminating the stay.   *Id.* ¶ 58.

### C.   Procedural History

Plaintiffs in this case are EMA GARP Fund, L.P., a Boston-based private equity investment fund, and Lawrence Lepard, the fund's asset manager and a professional investor. Compl. ¶¶ 9-10.   They filed this federal securities action under the Securities Exchange Act of 1934 on March 5, 2018.   *Id.* at 3.

Plaintiffs have conceded that they had ample notice of the Banro CCAA Proceedings prior to filing this action; indeed, the Complaint explicitly refers to Banro's "restructuring proceedings under the laws of Canada."   *Id.* ¶ 99.   Plaintiffs' current counsel also admitted that,

prior to his engagement, Plaintiffs had made "earlier submissions directly to the bankruptcy court in Canada."  Apr. 18, 2018 Hr'g Tr. at 20; *see id*. at 21 ("THE COURT:  That doesn't actually make me feel better, sir.  It suggests your that your client was aware of an ongoing reorganization proceeding, correct?  [PLAINTIFFS' COUNSEL]:  And I would concede that, absolutely, Judge.").  In fact, at the very outset of the Banro CCAA Proceedings on December 23, 2017, Plaintiff Lepard wrote directly to the Canadian Court alleging that Banro's assets were understated in the reorganization proceeding.  Dietrich Dec. ¶ 76; *id.* Ex. 22.  Counsel for Banro responded to Lepard on January 2, 2018, stating that his allegations were without merit, that the proper way to be heard on the matter was to hire a Canadian lawyer and appear in the Banro CCAA Proceedings, and that the stay imposed by the Initial Order precluded his filing any claims against the company or its officers and directors.  *Id.* ¶ 76 n.74.  On the same day, the Monitor also wrote to Lepard drawing his attention to the Initial Order and inviting him to engage in the Banro CCAA Proceedings.  *Id.*

Rather than participate in the ongoing reorganization proceeding by filing a timely claim, Plaintiffs' counsel instead filed this lawsuit one day before the March 6 Bar Date.  On the Bar Date itself, Plaintiffs' counsel wrote to the Monitor not to file a claim pursuant to the Claims Procedure Order, but instead to provide notice of the filing of the original complaint in this Court.  *Id.* ¶ 77; *id.* Ex. 23.  Banro's counsel responded a few days later, advising Plaintiffs that the Plan had already been approved by the creditors and that a motion to obtain a Sanction Order had been rescheduled to a later date in order to give Plaintiffs additional time before the hearing on the Sanction Order.  *Id.* ¶ 80; *id.* Ex. 26, at 2-3.  Counsel explained that Banro would be specifically requesting a declaration that the claims at issue in this action—which relate to the sale of Banro stock, and thus qualify as Equity Claims under the Plan and the Claims Procedure

9

Order, *id.* ¶¶ 60, 65, 84 —"have been and will be forever compromised, released and discharged, cancelled and barred in all respects," pursuant to the Plan and the Claims Procedure Order. *Id.* Ex. 26, at 2. Notwithstanding all of this clear and direct notice, and additional time, Plaintiffs declined to appear before the Canadian Court. *Id.* ¶ 83.

On March 27, 2018, the Canadian Court entered the Sanction Order, which included the requested release of all Equity Claims, including Plaintiffs' claims specifically. *Id.* ¶¶ 84-85. Thereafter, on March 29, 2018, the Canadian Court issued an endorsement—*i.e.*, an opinion— providing the Canadian Court's reasoning for approving the Plan (the "Endorsement"). Addressing the release, the Endorsement explained that the Canadian Court was "satisfied that the declarations requested in the Sanction Order in respect of the claims and causes of action raised in the Lepard Action are appropriate because the claims and causes of action are all Affected Equity Claims and are also barred as against the officers and directors because of non-compliance with the Claims Procedure Order." *Id.* ¶ 86.

On April 18, 2018, this Court held a pre-motion conference regarding the Defendants' request to file a motion to dismiss the Complaint. Pursuant to the Court's order, Defendants filed the instant Motion.

## LEGAL STANDARD

Motions to dismiss on international comity grounds may be brought under Federal Rule of Civil Procedure 12(b)(1). *See Duff & Phelps, LLC v. Vitro S.A.B. de C.V.*, 18 F. Supp. 3d 375, 377 (S.D.N.Y. 2014); *Republic of Colombia v. Diageo N. Am. Inc.*, 531 F. Supp. 2d 365, 381 (S.D.N.Y. 2007). The choice to extend comity is committed to this Court's discretion. *See Allstate*, 994 F.2d at 999.

Although "the court must accept all undisputed factual allegations as true and draw all reasonable inferences in the light most favorable to Plaintiffs," *Republic of Colombia*, 531 F.

Supp. 2d at 376, the Court may consider evidence outside the pleadings, such as affidavits or declarations, to resolve any disputed jurisdictional fact issues.  *See J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004) ("We may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue . . . ."); *Kramer*, 937 F.2d at 773 (holding district court properly took judicial notice of the condition of the junk bond market and related state litigation).  Courts in this Circuit routinely take judicial notice of documents filed in other courts (including foreign courts), the status of other lawsuits, and the substance of papers filed in those actions.  *See Kramer*, 937 F.2d at 773 ("[C]ourts routinely take judicial notice of documents filed in other courts . . . ."); *Lefkowitz v. Bank of N.Y.*, 676 F. Supp. 2d 229, 239, 249 (S.D.N.Y. 2009) ("To the extent that the affidavits provide documentation of other court proceedings, they are properly considered, since we may take judicial notice of those proceedings. . . .  Judicial notice may encompass the status of other lawsuits, including in other courts, and the substance of papers filed in those actions."); *see also, e.g.*, *Oui Financing*, 2013 WL 5568732, at *2 (ruling on motion to dismiss on comity grounds and holding court may take judicial notice of court filings in foreign bankruptcy proceeding).

Where issues of foreign law are raised, a court may consider declarations of foreign law filed by the parties pursuant to Federal Rule of Civil Procedure 44.1.  FED. R. CIV. P. 44.1; *see, e.g.*, *Oui Fin.*, 2013 WL 5568732, at *2 (ruling on motion to dismiss on comity grounds and holding court may consider Rule 44.1 declarations submitted by the parties regarding foreign law); *Allstate Life Ins. Co. v. Linter Grp. Ltd.*, No. 91 Civ. 1655 (RPP), 1992 WL 136849, at *7 (S.D.N.Y. June 1, 1992), *aff'd* 994 F.2d 996 (9th Cir. 1993) (considering declaration of Australian lawyer regarding Australian insolvency law filed in support of motion to dismiss on

comity grounds).  Questions of foreign law are questions of law, not fact.  FED. R. CIV. P. 44.1

("The court's determination must be treated as a ruling on a question of law.").

## ARGUMENT

## PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY ON INTERNATIONAL COMITY GROUNDS

"International comity has been described by the Supreme Court as 'the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.'"  *JP Morgan Chase Bank*, 412 F.3d at 423 (quoting *Hilton v. Guyot*, 159 U.S. 113, 164 (1895)).  "As a general rule, comity may be granted where 'it is shown that the foreign court is a court of competent jurisdiction, and that the laws and public policy of the forum state and the rights of its residents will not be violated.'"  *Allstate*, 94 F.2d at 999 (quoting *Cunard*, 773 F.2d at 457).

The Second Circuit has long recognized "foreign bankruptcy proceedings" as a "discrete category of foreign litigation that generally *requires* the dismissal of parallel district court actions."  *Royal & Sun Alliance Ins. Co. of Can. v. Century Int'l Arms, Inc.*, 466 F.3d 88, 92-93 (2d Cir. 2006) (emphasis added); *see also JP Morgan Chase Bank*, 412 F.3d at 424 ("We have repeatedly held that U.S. courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding."); *Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 246 (2d Cir. 1999) ("We have repeatedly noted the importance of extending comity to foreign bankruptcy proceedings."); *Victrix*, 825 F.2d at 713 ("American courts have long recognized the particular need to extend comity to foreign bankruptcy proceedings.").  This action should be no exception.

As described below, before dismissing a complaint on international comity grounds in favor of a foreign bankruptcy proceeding, the court must be assured that the foreign proceeding "abide[s] by 'fundamental standards of procedural fairness,'" and dismissal would not "violate the laws or public policy of the United States." *JP Morgan Chase Bank*, 412 F.3d at 428. Because the Banro CCAA Proceedings at issue here meet both standards, Plaintiffs' claims against Banro and Clarke should be dismissed.  Furthermore, the Banro Debtors' decision not to file a petition under chapter 15 of the Bankruptcy Code—an unnecessary step given that the Banro Debtors have very limited assets in the United States and their restructuring was limited to Canada—in no way alters that conclusion.

### A.     Plaintiffs' Claims Against Banro Should Be Dismissed

#### 1.   The Banro CCAA Proceedings Comport With Fundamental Standards Of Procedural Fairness

Courts in this Circuit agree that CCAA proceedings in general abide by "fundamental standards of procedural fairness." *Tradewell, Inc. v. Am. Sensors Elecs., Inc.*, No. 96 CIV. 2474(DAB), 1997 WL 423075, at *1 (S.D.N.Y. July 29, 1997) (quoting *Cunard*, 773 F.2d at 457); *see, e.g.*, *E&L Consulting, Ltd. v. Doman Indus. Ltd.*, 360 F. Supp. 2d 465, 470 (E.D.N.Y. 2005); *In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. 685 (Bankr. S.D.N.Y. 2010). Accordingly, courts have recognized the propriety of staying or dismissing parallel actions brought in U.S. district courts in deference to Canadian Courts.  *See, e.g.*, *Tradewell, Inc.*, 1997 WL 423075, at *1 (granting defendant's motion to stay on comity grounds in compliance with Canadian Court order); *E&L Consulting, Ltd.*, 360 F. Supp. 2d at 470 (recognizing propriety of extending comity to Canadian bankruptcy proceedings but dismissing on merits because co-defendant was American corporation); *cf. Oui Fin.*, 2013 WL 5568732, at *2 (granting motion to dismiss on comity grounds in favor of French restructuring proceeding).  The consensus among

courts on this point is not surprising:   "Canada is 'a sister common law jurisdiction with procedures akin to our own,' and thus there need be no concern over the adequacy of the procedural safeguards of Canadian proceedings."   *Cornfield v. Investors Overseas Servs., Ltd.*, 471 F. Supp. 1255, 1259 (S.D.N.Y. 1979) (quoting *Clarkson*, 544 F.2d at 630).

Indeed, CCAA proceedings satisfy the factors courts consider in assessing the "procedural fairness" prong of the comity inquiry.  *See Tradewell*, 1997 WL 423075, at *1. These factors include:

> whether creditors of the same class are treated equally in the distribution of assets; (2) whether the liquidators are considered fiduciaries and are held accountable to the court; (3) whether creditors have the right to submit claims which, if denied, can be submitted to a bankruptcy court for adjudication; (4) whether the liquidators are required to give notice to the debtors' potential claimants; (5) whether there are provisions for creditors' meetings; (6) whether a foreign country's insolvency laws favor its own citizens; (7) whether all assets are marshaled before one body for centralized distribution; and (8) whether there are provisions for an automatic stay and for the lifting of such stays to facilitate the centralization of claims.

*Id.* at *4 (citing *Allstate*, 994 F.2d at 999).  As the court in *Tradewell* recognized, CCAA proceedings treat creditors equally within separate classes; provide for a Monitor, satisfying the fiduciary requirement; permit creditors to submit claims and appeal denials of those claims; provide for creditors' meetings; and provide a court-imposed stay.  *Id.*  The *Tradewell* court concluded that CCAA proceedings were procedurally fair in spite of the fact that they "are not identical to the United States bankruptcy proceedings."[3]  *Id.* at *1.

Unsurprisingly, the factors that led the *Tradewell* court to conclude that CCAA proceedings were fair in 1997 compel the same conclusion today.  CCAA proceedings still

---

[3] For example, although CCAA proceedings do not require notice to all creditors before an injunction barring claims is issued, the court declined to find the proceedings lacking in fairness on that basis—particularly where the plaintiff suffered no prejudice due to his awareness of the pending injunction.  *Id.* at *3 & n.5.

14

provide for classes within which creditors are treated equally; appointment of a Monitor; a process by which affected individuals can submit claims and appeal denials; notice to the public of the proceedings; creditors' meetings; and a court-imposed stay.  Dietrich Dec. ¶¶ 8-40.  All of these procedures and requirements, moreover, were followed with respect to Banro's restructuring.  *Id.* ¶¶ 44-75.

That Plaintiffs' claims were extinguished and released by the Sanction Order approving the Plan does not undermine the fundamental fairness of the Banro CCAA Proceedings.  As is clear from correspondence Plaintiffs sent directly to the Canadian Court, the Monitor, and Banro's Canadian counsel, *see id.* ¶¶ 76-82, Plaintiffs had ample knowledge of:  (i) the ongoing nature of the Banro CCAA Proceedings; (ii) the stay imposed by the Canadian Court; (iii) the claims and Plan objection procedures available to them; and (iv) the hearing on the Sanction Order, which was to address the extinguishment of their claims.  In fact, the Banro Debtors added Plaintiffs to the official Service List to ensure Plaintiffs received proper notice of filings and hearings in the Banro CCAA Proceedings after the Banro Debtors learned of this action.  *Id.* ¶¶ 74, 81.  The Banro Debtors even requested that the Canadian Court adjourn the hearing on the Sanction Order specifically to provide Plaintiffs additional time to review and object to the proposed Plan.  *Id.* ¶¶ 72-73.

Rather than engage meaningfully in the Banro CCAA Proceedings, Plaintiffs chose instead to flaunt them by filing this action on the eve of the Bar Date with a litigation stay in place.  Plaintiffs' strategy of ignoring the CCAA proceedings does not make them unfair.  "The focus of the comity analysis . . . is whether the foreign proceeding '*in general*, provides a fair forum in which to litigate [Plaintiff's] claims'"—not whether "[the] Plaintiff is disappointed with the specific outcome."  *Oui Fin.*, 2013 WL 5568732, at *7 (emphasis added) (quoting *Allstate*,

15

994 F.2d at 999); *see, e.g.*, *In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. at 685 (applying comity to CCAA proceedings despite provision in sanction order releasing third-party non-debtors from claims and enjoining claims against third parties). To hold otherwise would mean that any litigant could sit on the sidelines of a foreign bankruptcy proceeding (as Plaintiffs did here), wait until their claims are extinguished by a reorganization plan, and then avoid application of longstanding comity principles by complaining that they have no avenue in which to pursue their claims. Such a rule would result in the piecemeal relitigation of debtor assets in various international fora, depleting the debtor's estate or reorganized debtor's assets and interfering with the reorganization process and result. Needless to say, that outcome runs contrary to "[t]he rationale underlying [comity, which] is that '[t]he equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding.'" *Oui Financing*, 2013 WL 5568732, at *5 (quoting *Victrix*, 825 F.2d at 713-14). As in U.S. bankruptcy proceedings, Banro, its officers and directors, and its creditors who have suffered losses and made compromises, are all entitled to the finality that the CCAA affords Canadian debtors and their stakeholders at the conclusion of a restructuring.

### 2. *Deferring To The Banro CCAA Proceedings Does Not Violate U.S. Law Or Public Policy*

The other factor courts consider—whether dismissal would violate U.S. law or public policy—precludes comity only in narrow circumstances that are absent here. In the analogous context of enforcing foreign judgments, the Second Circuit has held that "[a] judgment is unenforceable as against public policy [only] to the extent that it is 'repugnant to fundamental notions of what is decent and just in the State where enforcement is sought.'" *Ackermann v. Levine*, 788 F.2d 830, 841 (2d Cir. 1986) (quoting *Tahan v. Hodgson*, 662 F.2d 862, 864, 866 n.

17 (D.C. Cir. 1981)).  "The standard is high, and infrequently met. . . [O]nly in clear-cut cases ought it to avail [the] defendant." *Id.* (citation omitted).

The Second Circuit has made clear that affording comity in the context of foreign restructurings does "not violate any laws or public policies of the United States," as "'American courts have consistently recognized the interest of foreign courts in liquidating or winding up the affairs of their own domestic business entities.'" *Allstate*, 994 F.2d at 999 (quoting *Cunard*, 773 F.2d at 458).  The policy rationales that weigh in favor of extending comity are even more compelling where "'the granting of comity to a Foreign bankruptcy proceeding enables the assets of a debtor to be dispersed in an equitable, orderly, and systematic manner, rather than in a haphazard, erratic or piecemeal fashion.'" *Id.*  Given that "'the public interest in the fair and efficient distribution of assets in a bankruptcy is [] significant,'" granting comity in favor of foreign bankruptcy proceedings affirmatively "furthers United States policy"—not the other way around.  *Id.* (alteration in original) (quoting *Cunard*, 773 F.2d at 459).

Plaintiffs cannot meet the high standard for showing that dismissal on comity grounds would violate any law or public policy of the United States.  Plaintiffs describe "[t]he CCAA Proceeding [as] merely an effort by Banro . . . to divest its common stockholders as part of a corporate restructuring/take-over."  Plaintiffs' Pre-Motion Letter at 2, Apr. 4, 2018 (ECF No. 22).  Plaintiffs' attempt to disparage the Banro CCAA Proceedings underscores why deference to foreign proceedings is necessary:  namely, to prevent disgruntled members of an out-of-the-money constituency from circumventing and contravening the procedures and rulings of the court overseeing the process in which all other creditors and claimants are participating.

More to the point, Plaintiffs' gripes fall far short of establishing that dismissal of this action in favor of the Banro CCAA Proceedings would violate U.S. law or public policy.  There

is nothing "repugnant" to fundamental notions of decency or administration of law in a plan to restructure corporate assets.  To the contrary, reorganizing a company and equitably distributing its limited assets in a fair and transparent process is the fundamental purpose of a bankruptcy proceeding, whether under the CCAA or the Bankruptcy Code.

That Plaintiffs' claims arise under U.S. securities laws in no way renders dismissal contrary to public policy.  Courts regularly dismiss suits brought under federal laws, including securities claims, in favor of foreign bankruptcy proceedings.  In *Allstate*, the Second Circuit affirmed a trial court's decision to dismiss a case alleging securities fraud in light of pending Australian bankruptcy proceedings.  994 F.2d at 998-1000.  It also approvingly cited a decision of the bankruptcy court dismissing a securities action in deference to English restructuring proceedings.  *See id.* (citing *Lindner Fund, Inc. v. Polly Peck Int'l PLC*, 143 B.R. 807, 810 (Bankr. S.D.N.Y. 1992)).  As one district court concluded, *Allstate* and the decisions on which it relied "foreclose [any] argument that comity does not apply" simply because plaintiffs allege violations of federal law.  *E&L Consulting, Ltd.*, 360 F. Supp. 2d at 470-71 (recognizing the propriety of extending comity where plaintiffs alleged antitrust violations); s*ee also Smith v. Dominion Bridge Corp.*, No. CIV. A. 96–7580, 1999 WL 111465, at *3 (E.D. Penn. Mar. 2, 1999) ("The plaintiffs argue that the United States has an overriding public policy interest in enforcing its securities laws; however, deference may be given to foreign bankruptcy proceedings notwithstanding that the plaintiffs in this Court are Americans and the claims are based on the securities laws of this country.").

Nor can Plaintiffs demonstrate that Canada is an inappropriate forum for the resolution of their claims.  The Second Circuit has recognized that Canada provides an adequate forum for U.S. plaintiffs to raise claims based on the purchase or sale of securities on the New York Stock

Exchange.  *DiRienzo v. Philip Services Corp.*, 232 F.3d 49, 58-60 (2d Cir. 2000), *vacated on other grounds*, 294 F.3d 21 (2d Cir. 2002).  Had Plaintiffs filed a proof of claim in the CCAA proceedings, they may have been permitted to pursue claims against the insurance policy that indemnifies Clarke—which, if their claims had merit, may have afforded them relief.[4]  *See* Dietrich Dec. ¶¶ 59-64.  They also could have tried to persuade the Monitor and the Canadian Court that their claims against Clarke (rather than Banro itself) should not have been released, thus potentially permitting them to sue Clarke directly.  *See id.* ¶¶ 69-74.  Although Plaintiffs chose neither course and now have lost their opportunity, that is a result of their own choices, not any defect in Canadian law.  Because Canadian law would have afforded Plaintiffs an opportunity to vindicate the rights they assert in this case, "'[e]xtending comity to the Canadian proceeding does not frustrate an important public policy of the United States."  *E&L Consulting, Ltd.*, 360 F. Supp. 2d at 471.[5]

---

[4] At the hearing, Plaintiffs' counsel indicated that they believe their claim to be worth between $3 and $4 million—an amount they contend is low relative to the scope of the Banro CCAA Proceedings.  Apr. 18, 2018 Hr'g Tr. at 16.

[5] Contrary to Plaintiffs' contention (*see* Apr. 18, 2018 Hr'g Tr. at 24), *Bondi v. Capital & Asset Finance Management S.A.*, 535 F.3d 87, 89 (2d Cir. 2008), does not stand for the proposition that comity (let alone efficiency) would be served by allowing this litigation to continue.  *Bondi* involved a defendant that was a successor entity to the debtor and that, "in marked contrast to bankruptcy norms in the United States . . . , assumed all of the legal liabilities of its predecessor companies."  *Id.* at 89.  Hence, the securities litigation at issue in *Bondi* was not against the bankrupt entity, as here.  Moreover, the restructuring plan in *Bondi* included among its description of unsecured creditors those entities and individuals "whose claims are later verified by a court decision that has become final."  *Id.*  In other words, the bankruptcy plan contemplated that litigation against the newly formed entity would continue during and after the restructuring.  And finally, the successor entity was "already before the court to litigate its fault for the securities fraud."  *Id.* at 91.  Here, by contrast, there is no ongoing litigation outside the Banro CCAA Proceedings; the Plan does not permit the subsequent litigation of claims; and the Defendant is the debtor entity.

**B.      International Comity Also Supports The Dismissal Of Plaintiffs' Claims Against Clarke For Actions Taken As A Corporate Officer**

Plaintiffs' claims against Banro's CEO, John Clarke, should also be dismissed under principles of international comity.   In *Allstate*, the Second Circuit affirmed the trial court's dismissal of securities fraud claims against individual defendants in circumstances nearly identical to those here, based on its conclusion that the district court correctly extended comity to the debtor entity:

> [I]t cannot be said that the court abused its discretion where, as here, it would have been inefficient and inequitable to permit the individual claims to go forward. Indeed, since these individuals were sued solely because of their affiliation with the [bankrupt] companies, to allow these claims to go forward in the United States despite the dismissal as to the [bankrupt] companies would defeat the purpose of granting comity in the first place.

994 F.2d at 1000.

Following *Allstate*, district courts have dismissed claims against the representatives of an entity undergoing restructuring.   In *Oui Financing*, for instance, the court dismissed a claim against a debtor entity's president despite the fact that he guaranteed the loan at issue and, like Clarke, was not a party to the foreign proceeding.   2013 WL 5568732, at *11.   Finding that the president's "obligations [were] clearly closely intertwined with [the debtor entity's]," the court determined that "[p]ermitting Plaintiff to obtain a judgment against him . . . would very likely interfere with the implementation of the recently-adopted [restructuring] plan."   *Id.*; *see also id.* ("This is presumably why [French law] operates to stay actions against individual guarantors as well as the debtor itself and why, now that the safeguard plan has been approved, the [law] provides that creditors may not seek redress against [guarantors] outside the plan's terms.").

So too here.   As Plaintiffs' Complaint describes, Clarke was CEO of Banro during the period in which its common stock price fell.   Clarke's involvement in this case, as alleged in the

Complaint, is directly and inextricably tied to his role at Banro—specifically, the statements he purportedly made on behalf of the company.  *See, e.g.*, Compl. ¶¶ 59-63.  Moreover, Plaintiffs' alleged injuries flow from Banro's declining stock price, not from any act or omission of Clarke unrelated to Banro.  *Id.* ¶¶ 102-104.  Accordingly, the claims against Clarke relate to his role as CEO of Banro prior to its insolvency, and should have been resolved as part of the Banro CCAA Proceedings.

Indeed, recognizing that officers and directors could face liability for actions taken on behalf of the company prior to its reorganization, the Plan and the Sanction Order endorsing it included provisions specifically releasing all such director and officer liability claims.  These releases were required under the terms of the Support Agreement and were an integral part of the Plan.  Without them, the Plan likely would not have garnered the overwhelming support it did from essential parties in interest.  As in *Oui Financing*, then, allowing litigation to proceed against Clarke would "interfere with the implementation of the recently-adopted [restructuring] plan."  2013 WL 5568732, at *11.  And as in *Allstate*, splitting the action by allowing claims to proceed against Clarke while dismissing the claims against Banro "would defeat the purpose of granting comity in the first place."  994 F.2d at 1000.

Plaintiffs' letter brief asserted that "there is no legal or equitable basis to dismiss the claims against Defendant Clarke in favor of a court in Canada."  Plaintiffs' Pre-Motion Letter at 2.  In light of *Allstate* and the other authority cited above, however, there can be no doubt that Circuit precedent directs precisely that outcome.

## C.    Banro Was Not Required To File A Chapter 15 Petition

Plaintiffs have argued that the Court cannot rely on comity principles to dismiss this action because the Banro Debtors did not file a petition for recognition of the CCAA proceedings

under chapter 15 of the U.S. Bankruptcy Code. *Id.* That position is incorrect. Binding and persuasive authority demonstrates that, even after chapter 15's enactment, parallel litigation may continue to be dismissed on international comity grounds where appropriate.

Chapter 15 is geared towards a specific problem: "In cross-border liquidations[,] creditors would initiate multiple bankruptcy proceedings to recover assets from a debtor in jurisdictions other than the site of the principal liquidation." *Trikona Advisers Ltd. v. Chugh*, 846 F.3d 22, 30 (2d Cir. 2017). To promote "uniformity and efficiency," chapter 15 was enacted to allow "coordination of domestic and foreign proceedings into a single bankruptcy," enabling "foreign representatives appointed in connection with foreign proceedings to seek recognition of those proceedings in United States courts as a means of requesting United States assistance in administering the main liquidation." *Id.*

Chapter 15, however, does not *require* a foreign entity or representative of a foreign bankruptcy to file a petition in the United States under any circumstances; rather, it *permits* foreign courts or representatives to seek assistance from U.S. courts in order "to provide effective mechanisms for dealing with cases of cross-border insolvency." 11 U.S.C. § 1501(a), (b). "Consistent with its limited purpose, 11 U.S.C. § 1501(b) specifies four circumstances in which chapter 15 applies":

> (i) when a foreign court or representative seeks assistance in the United States in connection with a foreign proceeding;
>
> (ii) when assistance is sought abroad in connection with a U.S. bankruptcy;
>
> (iii) when a debtor has parallel proceedings in the U.S. and abroad; and
>
> (iv) when creditors or other interested persons in a foreign country seek to commence or participate in a case or proceeding under the Bankruptcy Code.

*Trikona Advisers*, 846 F.3d at 30-31.  All four "scenarios assume that (1) a United States court is being asked either to assist in the administration of a foreign liquidation proceeding or to administer a liquidation proceeding itself, or (2) a foreign court is being asked to assist in administering a liquidation proceeding in the United States."  *Id.* at 31.

Where, as here, a debtor entity's assets and bankruptcy proceedings do not materially involve the United States, neither the terms nor the purpose of chapter 15 is implicated.  Although Banro's common stock was traded on the New York Stock Exchange, Banro has no significant property in the United States for a bankruptcy court to administer; its assets were instead located primarily in the DRC, Barbados, and Canada.  Dietrich Dec. ¶ 43.  Indeed, Banro's only property in the United States comprises shares in an inactive subsidiary and attorney retainer payments.  *Id.*  As a consequence, the Banro Debtors had no need to seek the assistance of U.S. courts in the administration of the Banro CCAA Proceedings by filing a parallel bankruptcy proceeding in the United States.  Put differently, although chapter 15 was available to the Banro Debtors, they had no reason to expend the time or money necessary to make use of that process, which would unnecessarily deplete the estate of key assets.

Contrary to Plaintiffs' contention, the Banro Debtors' decision to forgo an unnecessary chapter 15 proceeding in no way prejudices Banro's ability to defend this action based on longstanding principles of comity.  In affirming a district court's decision to recognize a foreign judgment on comity grounds, *Trikonka Advisers* rejected the argument that chapter 15 preempts comity as a matter of state common law, citing the statute's "very narrow purpose."  846 F.3d at 35.  Although that decision involved granting comity to a foreign judgment rather than dismissing a lawsuit on comity grounds, there is no reason to believe that the Second Circuit would reach a different conclusion in these circumstances, as interpreting chapter 15 to displace

23

traditional notions of comity "would do nothing to advance the stated objectives of statute." *Id.*; *cf. Cunard*, 773 F.2d at 456 ("It is clear that the drafters of [chapter 15's predecessor statute] did not intend to overrule in foreign bankruptcies well-established principles based on considerations of international comity.").[6]

Consistent with that understanding, district courts have continued to rely on longstanding comity principles in dismissing or staying actions in deference to foreign bankruptcy proceedings post-enactment of chapter 15, even where no chapter 15 petition was filed. *See, e.g.*, *Oui Fin.*, 2013 WL 5568732, at *4-9 (granting defendants' motion to dismiss on comity grounds in the absence of a chapter 15 petition, while relying on *Allstate* and other decisions). Here too, there was no need for Banro to file a chapter 15 proceeding solely for the purpose of defending against this action. The precedent of this Circuit makes clear that comity alone provides a sufficient basis to dismiss Plaintiffs' Complaint.

---

[6] At the pre-motion hearing, Plaintiffs cited *Oak Point Partners, Inc. v. Lessing*, No. 11–CV–03328–LHK, 2013 WL 1703382 (N.D. Cal. Apr. 19, 2013), in support of their argument that Banro was obligated to file a chapter 15 petition. But the court in that case explicitly distinguished its own Circuit's approach to international comity from the Second Circuit's approach. *Id.* at *3-5 (contrasting the Ninth Circuit's approach, which does not automatically defer to foreign bankruptcy proceedings, with the Second Circuit's rule from *JP Morgan* and *Allstate* that "U.S. courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding").

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court enter an order dismissing the Complaint against Banro and Clarke with prejudice and granting such other and further relief as the Court deems just and proper.

Dated:   May 18, 2018
         New York, New York

Respectfully submitted,

 /s/Stephen M. Baldini
Stephen M. Baldini
Ira S. Dizengoff
Sara L. Brauner
Stephanie Lindemuth
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY  10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
sbaldini@akingump.com
idizengoff@akingump.com
sbrauner@akingump.com
slindemuth@akingump.com

*Attorneys for Defendants Banro Corporation and John Clarke*